Blue Ribbon Products Co., Inc. v. Commissioner.
Blue Ribbon Products Co. v. Commissioner
Docket No. 51194.
United States Tax Court
T.C. Memo 1956-158; 1956 Tax Ct. Memo LEXIS 140; 15 T.C.M. (CCH) 786; T.C.M. (RIA) 56158; June 29, 1956
*140 Officers' salaries: Sec. 23(a)(1)(A), 1939 Code. - All of petitioner's stock was owned in equal amounts by its two principal officers. Officers' salaries were paid according to a formula which provided that all net profits remaining after a 20 per cent reserve, 6 per cent for capital stock, and payment of all taxes, would be divided equally between the two stockholders. The Commissioner determined that the compensation paid to the two officers was partially excessive. Upon the facts, held, that the compensation paid was excessive in part; a reasonable allowance for compensation, in a larger amount than respondent allowed, is determined. Cyrus B. King, Esq., for the petitioner. T. M. Mather, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion The Commissioner has determined a *141 deficiency in income tax for the fiscal year ended April 30, 1950, and a deficiency in income and excess profits tax for the fiscal year ended April 30, 1951, as follows: Fiscal year ended
Deficiency
April 30, 1950
$19,459.59
April 30, 1951
13,981.70
The question to be decided is what amounts constitute reasonable allowances for compensation for the services rendered by petitioner's president and vice president during the taxable years under section 23(a)(1)(A) of the 1939 Code. Petitioner paid $60,870 (round figures) to its president and vice president, each, as compensation for service rendered during the taxable year ended April 30, 1950, and $50,074.68 to each for the taxable year ended April 30, 1951. The amounts of compensation were computed under a formula which was adopted by petitioner in 1948. Under the formula the amount of compensation for services was contingent in each year upon the amount of net profits after reserves for working capital, dividends, and Federal and state taxes. The Commissioner has determined that for each of the taxable years, a reasonable allowance for compensation for the services of each officer is $36,000, and on that basis *142 he has disallowed deductions of the excess which the officers received. Other determinations of the Commissioner are not contested. Findings of Fact Petitioner is a California corporation having its principal office in San Francisco. It filed its returns for the taxable years with the collector of Internal Revenue for the first district of California. Petitioner keeps its books and makes its returns under an accrual method of accounting on the basis of a fiscal year ending on April 30. Petitioner is engaged in the business of buying and selling coffee, the sales of which constitute 92 per cent of its business. It sells teas, spices, and other related products, also. Petitioner specializes in a well-balanced blend of coffee and part of its business is the blending of coffee. Petitioner buys green coffee of various kinds, types, and grades; it roasts the green coffee; it sells the finished product, a blended coffee. Petitioner sells roasted coffee and other products to restaurants, hotels, institutions, and Government agencies. The market in which petitioner sells is chiefly the northern part of California, i.e., north of Fresno, and Nevada. Petitioner maintains branch warehouses *143 in California in San Jose, Oakland, Stockton, Santa Rosa, and Sacramento, and in Reno, Nevada. Petitioner also has customers in Los Angeles and Santa Barbara, California, and in Tucson, Arizona. Petitioner was incorporated on May 1, 1948 by George J. Harney (hereinafter referred to as Harney) and John A. Thompson (hereinafter referred to as Thompson). It acquired the assets and succeeded to the business of a partnership in which Harney and Thompson were the only members of the partnership, each owning a 50 per cent interest. The partnership did business under the name, Blue Ribbon Products Company, and its business was the same as petitioner's business, namely, the selling of coffee, tea, spices, flavoring extracts, and other more or less related items. Prior to the dissolution of the partnership on or about May 1, 1948, Harney's and Thompson's shares in profits of the partnership for the period July 1, 1947 to April 30, 1948, amounted to about $55,000, each. At the time of its incorporation, petitioner's capital consisted of 1,000 shares of common stock of a par value of $100 per share, or $100,000. Harney and Thompson, each, received 50 per cent of petitioner's stock, and each *144 continued such ownership of petitioner's stock through the taxable years and until the death of Harney. Harney died suddenly on September 10, 1954 from heart disease. At all times material, including the taxable years, Harney was petitioner's president, and Thompson was the vice president and the general manager. The directors of petitioner have been Harney and Thompson and their wives. Both Harney and Thompson, at all times, devoted their entire time to the business of petitioner, and neither devoted time to any other business activity. Since is incorporation, and during the taxable years, petitioner has had about 40 employees in addition to Harney and Thompson. The 40 employees were engaged as follows: 17 were salesmen; 7 were factory workers; 4 were maintenance men; 5 were office workers; and the balance, about 7, were engaged in various administrative and miscellaneous occupations. At the time of petitioner's organization Harney and Thompson, each, loaned $40,000 to petitioner, which loans are evidenced by petitioner's notes for $80,000. The opening balance sheet of petitioner, upon its incorporation showed total assets of $297,163.25; current liabilities of $87,052.29; *145 notes payable, $80,000; capital stock, $100,000; and paid-in surplus, $30,110.96. The closing balance sheet of the predecessor partnership showed assets and current liabilities in the same amounts, and the interests of Harney and Thompson as $210,110.96. The background of petitioner's business from 1918 to 1948 is, briefly, as follows: In 1918, Harney, who was born in 1899, founded a business, in San Jose, California, of selling coffee, tea, spices, soaps, cookies, and other such commodities. The business was carried on largely by selling from a horse and wagon which went from house to house. Shortly thereafter, Harney's brother-in-law, Frank L. Hussey, became associated with Harney. Hussey had been employed by Great Western Tea Company in San Francisco. The business was continued in San Jose until 1926 when it was moved to San Francisco to a building which was built for Blue Ribbon Products. At that time equipment for the operation of the business was installed in the building. When petitioner was incorporated it continued the occupancy of the building and petitioner still maintains its principal office in the same building. In 1930 or 1931, Blue Ribbon was incorporated for *146 the first time and its stockholders were Harney, Hussey, and A. J. Donaldson. In 1929, Thompson became a full-time employee of Blue Ribbon. Thompson was born in 1902. His first job, when he was 15 years old, was in 1917, with C. E. Bickford & Co., green coffee brokers in San Francisco; he was employed as an errand boy. Between 1917 and 1929, Thompson held several positions with various coffee concerns on the Pacific coast. Thompson's business experience is described hereinafter in more detail. In 1941, Thompson bought Donaldson's stock, one-third in Blue Ribbon for $20,000. About one year later the form of Blue Ribbon's business was again changed to a partnership upon the dissolution of the first corporation, Harney, Hussey, and Thompson being partners. Subsequently, in 1944, Harney and Thompson bought Hussey's interest for $70,000, each paying $35,000, and Blue Ribbon was carried on as a partnership in which Harney and Thompson were equal partners until May 1, 1948, when the present corporation was formed, as has been stated above. In 1930, Blue Ribbon began selling to restaurants and this phase of its business grew steadily. In 1949, the house to house method of selling was *147 abandoned and the business of Blue Ribbon consisted of selling to restaurants and hotels, and it also obtained some contracts from Government institutions or agencies. Since 1941 the respective activities of Harney and Thompson in the conduct of the business of Blue Ribbon have been as follows: Harney was in charge of selling and promotion, and he was in charge of buying green coffee and other raw materials, of the mechanical processes of blending and roasting coffee, and he was also in charge of finance, credit, personnel, and all other administrative matters. Since the incorporation of petitioner (and before), the entire responsibility for determining and carrying out policies of Blue Ribbon was (until Harney's death in 1954) divided between Harney and Thompson, and no other employees were given, or allowed to assume, any responsibility for policy determinations. Since the incorporation of petitioner, the compensation in each fiscal year for the services of Harney and Thompson has been determined by the application of a formula under which the amount of the annual compensation of Harney and Thompson has depended and been contingent upon the net earnings of the business. The *148 method for computing the annual compensation of Harney and Thompson was adopted by petitioner on September 1, 1948, by resolution of petitioner's directors at a meeting held on that date. The resolution of the directors adopted on September 1, 1948 provided in part as follows: "RESOLVED, that at the close of the fiscal year of this corporation, there shall be deducted from the profits of its operation, a reserve of twenty (20%) percent to cover expansion of fixed assets and working capital, which said deduction shall be made from the net profit realized by the corporation before the withdrawal of compensation to its officers; that said corporation shall declare a dividend to stockholders of six (6%) percent on their invested capital; that thereafter, all federal and state income taxes shall be paid; the funds thereupon remaining shall then be divided equally between George J. Harney and John A. Thompson in full and complete compensation for services rendered to this corporation. The net profit herein mentioned shall be that as shown by the books of the corporation after review and adjustment by the corporation's Certified Public Accountant. The compensation to the said George J. *149 Harney and John A. Thompson shall be paid on an annual basis within seventy-five (75) days after the end of the corporation's fiscal year and shall be compensation for services rendered during the fiscal year then ended and shall be a liability of the corporation as at the end of the fiscal year." * * *
Thompson and Harney, each, were required to pay, personally, all of his own expenses incurred as an employee of the petitioner, and to personally pay all entertainment expenses (but not traveling expenses), incurred by salesmen employed by petitioner. Petitioner paid the traveling expenses of its salesmen. Harney paid more of the above expenses than Thompson paid. In each of the taxable years petitioner paid to Harney and Thompson, each, in addition to the compensation for services paid to each, an expense allowance of $3,000, and automobile expense allowance of $1,200. Whatever each spent in excess of these allowances, each paid out of his own funds. During the taxable years and until the compensation of Thompson and Harney could be determined under the formula, each of them withdrew from petitioner, $375 per week, and sometimes other withdrawals. Withdrawals by Thompson *150 and Harney were carried on the books of petitioner as accounts receivable from the individuals. After the end of each fiscal year, the petitioner would give to each of the officers a check for the total amount of compensation determined under the aforementioned formula, and the individuals would reimburse the petitioner for the amount withdrawn during the year and charged as accounts receivable. The withdrawals for the fiscal year ended April 30, 1950, were as follows: Thompson, $36,234.04, and Harney, $33,234.04; and for the fiscal year ended April 30, 1951: Thompson, $22,500, and Harney, $30,300. For the fiscal year ended April 30, 1950, Thompson's compensation amounted to $60,870.22, plus the expense allowance of $4,200. Expenses deducted on his personal income tax return amounted to $4,200. For fiscal year ended April 30, 1951, Thompson's compensation amounted to $50,074.68, plus the expense allowance of $4,200. Expenses deducted on his personal income tax return amounted to $6,804.81. For fiscal year ended April 30, 1950, Harney's compensation amounted to $60,870.22, plus the expense allowance of $4,200. Expenses deducted on his personal income tax return amounted to $9,297.39. *151 For fiscal year ended April 30, 1951, Harney's compensation amounted to $50,074.68, plus the expense allowance of $4,200. Expenses deducted on his personal income tax return amounted to $9,637.97. The actual computation of the compensation of the two officers, according to the formula, was made by Webb and Webb, certified public accountants. The net profits of petitioner before officers' salaries, the total officers' salaries, the dividends paid, and the profits retained in the business by petitioner during the fiscal years ended April 30, 1949 through 1954, were as follows: Net profit
Fiscal
before
Federal
year
officers'
Officers'
Dividends
income tax
Profits
ended
salaries
salaries
paid
paid
retained *
4/30/49
$163,084.68
$ 96,504.20
$ 6,000
$25,300.58
$35,279.90
4/30/50
212,292.66
121,740.44
10,000
34,257.86
46,294.36
4/30/51
157,835.22
100,149.36
5,000
21,119.10
31,566.76
4/30/52
116,730.49
69,134.44
5,000
19,212.25
23,383.80
4/30/53
98,359.21
59,265.88
5,000
14,421.50
19,671.83
4/30/54
197,758.21
115,349.70
6,000
36,857.39
39,551.12
The total amounts of officers' salaries *152 set forth above were received one-half each by Harney and Thompson. For the taxable year ended April 30, 1950, each received $60,870.22, and for the taxable year ended April 30, 1951, each received $50,074.68. Petitioner's operations have been financed exclusively by the investments and loans of Harney and Thompson, by retained earnings of the business, and by loans made to the petitioner by the American Trust Company. The principal indebtedness of petitioner to the American Trust Company at the end of each quarter of the taxable years was as follows: Principal
Date
indebtedness
July 31, 1949
$ 50,000
October 31, 1949
125,000
January 31, 1950
50,000
April 30, 1950
75,000
July 31, 1950
October 31, 1950
January 31, 1951
75,000
April 30, 1951
The total sales, gross profit, and taxable income of petitioner as reflected on its books of account and tax returns for the fiscal years ended April 30, 1949 through 1954 were as follows: Fiscal year
Total
Gross
Taxable
ended
sales
profit
income
April 30, 1949
$1,414,652.74
$416,561.94
$66,580.48
April 30, 1950
1,725,614.30
484,112.59
90,552.22
April 30, 1951
1,960,899.86
434,677.91
57,685.86
April 30, 1952
2,007,830.54
378,788.81
47,596.05
April 30, 1953
1,915,317.64
360,618.74
39,093.33
April 30, 1954
2,231,618.77
478,604.71
82,408.51
*153 The petitioner and its immediate predecessor partnership have made a profit in each year of operation. Yearly total sales increased from approximately $1,414,000 in fiscal year 1949, to approximately $2,230,000 in fiscal year 1954, an increase of better than 50 per cent. The taxable years 1950 and 1951, each, showed increases in total sales over the previous year. Cost of sales, expressed as a percentage of sales, in the fiscal year 1950 was 71.9 per cent; and in the fiscal year 1951, was 77.8 per cent. The cash position of the petitioner during the fiscal years 1950 and 1951 was never very heavy; the accounts receivable were considerable, because of the Government contracts; and the inventory in both years was very high. There is a rapid turn over of cash; 60 per cent of sales were made on a cash-on-delivery basis; merchandise purchased was paid for on delivery, except that, as to goods delivered to a warehouse, payment was made in about 10 days. Petitioner borrowed consistently from a bank in the fiscal years 1950 and 1951. The value of inventory on hand on April 30 of each of the following years was as follows: 1949
$164,578.77
1950
257,911.83
1951
168,692.06
*154 Because of the need for working capital, it was not possible to repay indebtedness represented by notes to stockholders in the taxable year 1950 or 1951. At the end of fiscal years 1950 and 1951, petitioner was indebted to its two stockholders in the amount of $88,000. Indebtedness to American Trust Company in these years ranged from zero to $125,000. In the taxable years ended April 30, 1950 and 1951, the officers' salaries, stated as a percentage of gross profit, and as a percentage of net income before officers' salaries, were as follows: Year
Percentage of net
ending
Percentage of
income before
April 30
gross profit
officers' salaries
1950
25.147
57.345
1951
23.039
63.451
The sales department, under the direction of Harney in the taxable years, consisted of route men who delivered the coffee and products to the customer, and the salesmen who sold new accounts. During the taxable years, the petitioner had from 1,400 to 1,500 accounts, and this number remains rather constant. The customers ranged from such large and wellknown hotels, restaurants and institutions as the Claremont and Leamington Hotels, Mel's Drive-In, Ott's Drive-In, the race *155 tracks, Greyhound Lines, St. Mary's College, and the International House at the University of California, down to small restaurants and coffee shops. Of approximately 1,500 accounts, petitioner furnished coffee-making equipment to about 1,400. This equipment consisted generally of automatic coffee-makers, gas and electric stoves, and urns. In the taxable years here involved, the equipment furnished was principally urns and Goodrich Stoves. The equipment was furnished under a contract which provided that petitioner would permit the customer to use the equipment, and would maintain the equipment, so long as the customer purchased a specified quantity of coffee in a given period. In some instances, where coffee-making equipment was owned by the customer, as in the case of some of the larger hotels, petitioner serviced the equipment. Petitioner maintained a service department to service and maintain equipment at all hours and every day of the week. In the case of customers who were at considerable distances from San Francisco, as in Los Angeles, Santa Barbara, or Tucson, Arizona, petitioner would send a man to service the equipment, if required. Petitioner sold only one blend of *156 coffee, and charged the highest price in the area, to restaurants and hotels. As an example of this, petitioner's average price to the Greyhound Lines was from 4 cents to 6 cents per pound higher than the price offered by competitors in other areas, but the Greyhound Lines were willing to pay this higher price because of the equipment furnished, the service rendered, and because the managers were satisfied with the quality of the coffee. There is a heavy mortality in the business of selling to restaurants because of changes of ownership and business failures. The experience of petitioner is that it loses an average of 250 accounts per year for these reasons, but by obtaining new customers, it has been able to keep the total number of accounts at from 1,450 to 1,500. In some instances petitioner has kept customers for as long as 15 to 20 years. Petitioner sold coffee on contracts to various governmental agencies. These agencies would issue invitations for bids, setting forth the required standards. Contracts, when made with such agencies, cover a period of from 90 days to 4 months during which period petitioner would be bound to deliver coffee at the price stated in the contract. *157 Petitioner was the successful bidder for many of these contracts in the taxable years here involved. Bidding on such contracts is a highly specialized field because to profitably sell under such contracts, the bidder must be able to anticipate the condition of the coffee market for a considerable period in the future. All such contracts made by petitioner during the taxable years here involved were profitable. Thompson was responsible for the contracts entered into by petitioner. Petitioner at all times attempted to maintain a well-balanced blend of coffee, that is, a blend with no noticeable distinctive flavor. Petitioner has always sold but one quality and one blend of coffee. To produce this, six or seven different types, grades, and growths of coffee are used. If any particular type of coffee is scarce or highly priced, petitioner substitutes another type but attempts to maintain a uniform blend regardless of the type of coffee used. The blending of coffee is a recognized profession, requiring experience of from 10 to 15 years to acquire the necessary skills. It is estimated that a coffee roaster would have to pay from $20,000 to $25,000 a year to an experienced coffee blender. *158 From 15 to 20 representatives of green coffee brokers and importers call daily at petitioner's office, with samples of green coffee and lists of coffee available and scheduled to arrive in San Francisco. Petitioner has cultivated the green coffee importers and brokers, and has been able to have them call with their offerings at its place of business daily, or every other day. This is difficult for a small firm. There are over one hundred different kinds of coffee and many hundreds of gradings within those hundred kinds. Samples submitted by representatives of brokers and importers are cup-tested to determine if they can be used to produce petitioner's blend, if the price is right. There is considerable differential in the price of various types of coffee, and petitioner purchases the lower priced types when they can be used to produce the desired blend. The price of the type of coffee known as Santos No. 4 in New York is regarded in the trade as the barometer of the market price of green coffee. During the taxable years here involved, the green coffee market was comparatively stable for six months, and then prices started to rise. This rising market continued through petitioner's *159 fiscal year 1951. In anticipation of the rising market and because of reports which Thompson heard, and his observations during a trip to South America in May and June of 1949, petitioner bought coffee heavily, and sharply increased its inventory, through the calendar year 1949 and into early 1950. To do so, petitioner borrowed so much money from the bank, that it was feared that it would exceed its credit limits. The principal balance of its indebtedness to the bank was higher on October 31, 1949, than at the end of any other calendar quarter in the taxable years here involved. As a result of these heavy purchases of coffee, petitioner's inventory increased greatly in value between April 30, 1949 and April 30, 1950. Petitioner carried in stock some of the coffee purchased at lower prices into its fiscal year 1951. Thus, for example, petitioner, on October 13, 1950, had on hand 126 bags of coffee marked, Lemeke-1, and designated as Lot No. 3045, which it had purchased at the price of 24 3/4 cents per pound on July 25, 1949. Other coffees on hand on October 13, 1950 cost petitioner from 43 cents to 54 cents per pound. Petitioner was in an excellent position marketwise during the *160 taxable years here involved. The cost of green coffee to petitioner was consistently less than the price of Santos No. 4 coffee. In 1949 and 1950, petitioner purchased more coffee than it needed, so that it would have a supply, and in 1951 it reduced its purchases. Petitioner's selling price of roasted coffee to its customers is determined by a mark-up over the market price of coffee. Consequently, petitioner's profit on the coffee purchased in the calendar year 1949 was higher than it would have been if it had not purchased coffee before the increase in the price of green coffee. The executive of petitioner responsible for green coffee purchases, Thompson, did an outstandingly good job of building inventory at a time when prices were low, and of liquidating that inventory at a time when prices were relatively high. Thompson was responsible for the purchasing policy. At all times during the history of the business enterprise, and including the taxable years here involved, Harney was the sales executive in charge of promotion, and selling, and of the sales force. In addition, during his lifetime, all policy matters of petitioner were discussed fully by Harney and Thompson together. *161 Harney preferred to hire for the sales force young, inexperienced men, and to train them in his own way. He frequently went out with his salesmen to get a prospect to sign a contract, that is, to close a sale. In the taxable years, he conducted sales meetings. He traveled in the territories. He was in constant contact with his salesmen, and reviewed their work regularly. He maintained a close relationship with his salesmen, and helped them when they needed help. Harney, as a sales executive, was a salesman, with unusual ability to close a deal. He had numerous contacts and devoted his thinking and living to making contacts so that he could sell accounts. He personally sold many large accounts. Harney entertained lavishly to develop business contacts, and devoted considerable time to various organizations for the same purpose. Neither his entertaining nor his membership in organizations was for his personal pleasure. Harney worked twelve hours a day and then took business work home with him. He had no other business interests. Harney worked closely with customers of petitioner, and when they needed it he gave them personal and business help. As an employee and officer of petitioner, *162 Thompson, during the taxable years and before, had full charge of blending coffee and handling the Government contracts and he had the responsibility for establishing credit policies, supervising the office, pricing, handling labor negotiations and banking.He determined which kinds and types of coffee to buy and use, and when to substitute one kind for another. Thompson is an expert in the cupping of coffee and in blending coffee. In the taxable years here involved, Thompson purchased or ordered purchased 90 per cent or more of the green coffee bought by petitioner. It was he who had the knowledge of the market and the experience required. Even when Thompson was away from his office, his assistant coffeeman is in constant touch with him and follows his policies. Thompson worked long hours, doing much of his work, particularly on Government contracts, at home at night. The services rendered by Harney and by Thompson in each of the taxable years were of equal value to petitioner. Neither Harney nor Thompson rendered greater services in 1951 than in 1950, and the services of both in 1950 and in 1951 were substantially the same. Reasonable compensation for the services rendered by *163 Harney and Thompson during the fiscal years 1950 and 1951 is $45,000, each. The stipulated facts are incorporated herein by this reference. Opinion HARRON, Judge: The petitioner paid to each of its principal officers for services rendered in the fiscal years 1950 and 1951, $60,870.22, and $50,074.68, respectively. Respondent determined that the compensation paid to each officer was partially excessive to the extent of $24,870.22 for 1950, and $14,074.68 for 1951. He allowed deductions of $36,000 in each taxable year. The question to be decided is what amount constitutes reasonable compensation for the services rendered by each officer in each of the taxable years. Special scrutiny must be given to the compensation paid by a corporation when all of the stock is held by the officers because of the lack of arm's-length bargaining, which in turn may indicate an intent to effect a distribution of earnings in the guise of salaries. , affirming a Memorandum Opinion of this ; ; ; *164 ; . In this case, all of the taxpayer's stock was owned by its two principal officers who were also directors, Harney and Thompson, who had been the sole partners in the partnership to whose business petitioner succeeded in 1948. Shortly after petitioner was organized, the directors of petitioner, Harney and his wife, and Thompson and his wife, adopted a formula under which the compensation in each year of Harney and Thompson would be determined. The formula provided that 20 per cent of profits would be retained in the business and 6 per cent on invested capital would be distributed as dividends on the capital stock, and that the balance, after paying Federal and state income taxes, would be divided equally and paid to Harney and Thompson as compensation for services. Petitioner applied this formula each year, including the taxable years. It is obvious that the method used by petitioner in computing officers' compensation operates so as to put a ceiling on the amount of earnings available for dividends, and it may operate also to allow a more generous proportion of net *165 profit for compensation of officers, depending upon the size of net profit. Since no deduction is allowed for dividends distributed to stockholders, the formula can operate to achieve a tax advantage to petitioner through the computation of the amount of the officers' salaries. The officers of the petitioner, also directors, were in a position to authorize this method of computing their own compensation. The formula was not an arm's-length agreement. The formula differs from some other types of contingent compensation methods because it incorporates a ceiling on the percentage of net profit which may become available to the common stock. We do not have here, therefore, the kind of contingent compensation arrangement as was present in , upon which petitioner relies, where it was said that a policy of fixing compensation on a contingent basis "is based primarily upon sound business principles." Furthermore, the compensation paid to petitioner's officers under petitioner's formula has a relationship to stockholdings because each officer owned 50 per cent of petitioner's stock, each officer was to receive 50 per cent of the *166 net earnings available for salaries under the formula, and both officers had complete control of petitioner. In , upon which petitioner relies, none of the salaries (which were computed on a contingent basis) had any relation to stockholdings and neither one of the officers whose compensation was in dispute at any time had a controlling interest in the corporation. In Regulations 111, section 29.23(a)(6), subparagraph 2, it is said, in effect, that compensation paid on a contingent basis fundamentally is not to be treated on any basis different from that applying to compensation computed at a flat rate, and that "any form of contingent compensation invites scrutiny as a possible distribution of earnings." We have scrutinized carefully all of the evidence in this case as we must do under all of the circumstances. Petitioner presented testimony of an expert witness who had made a study of the trade in which petitioner is a member. However, his analysis was general, it involved statistical comparisons, and it did not present specific comparison of petitioner's officers services with the services and salaries of *167 executives of comparable concerns engaged in the same business. Respondent, on the other hand, called two witnesses who testified specifically about the amounts of the salaries paid to the presidents of two of petitioner's competitors and about the volume of the business of each competitor. This is an instance where the respondent produced rebuttal evidence. Cf. . Consideration has been given to the testimony of petitioner's expert witness as well as to the testimony of the witnesses produced by the respondent. All of the testimony has been helpful. But in the light of the entire record, we are unable to regard the testimony of either petitioner's expert or of respondent's witnesses as decisive of the issue. The trier of the facts is not obligated to accept the opinion of petitioner's expert witness as to the reasonableness of the compensation paid to Harney and Thompson in each of the taxable years. ; ; . *168 The method followed by petitioner in computing the officers' compensation for the services rendered in the taxable years has been given as much favorable consideration as we think it is entitled to receive. In fact, the reservations which are made under the formula for setting apart 6 per cent on invested capital for dividends militates in petitioner's favor. Cf. , affd. . Also, we have observed that in some instances contingent plans for compensating officers of a corporation have been approved even though such plan results in compensation greater than, perhaps, otherwise would have been paid. See, ; and . On the other hand, it does not follow that a contingent plan for compensation must be accepted in all cases. . There is no fixed rule by which a reasonable allowance for compensation can be determined. What is reasonable is dependent upon the facts and circumstances of each particular case. ; *169 ; . The evidence establishes that both Harney and Thompson were executives of exceptional ability, energy, and resourcefulness, and both had had long experience in the trade of buying, blending, and selling coffee. Each devoted all of his time to petitioner's business and worked long hours. Each was an expert in his field. Harney was a skillful promoter and salesman. Thompson is a skillful buyer of green coffee and a capable executive. The success of petitioner's business has been due entirely to the work and skill of its two officers. They have been able managers and they have maintained, consistently, excellent and profitable relations with petitioner's customers. Consideration has been given to the increases in petitioner's sales in each of the taxable years. Total sales in 1950 increased $310,961 above gross sales for 1949; and in 1951, total sales increased $546,247 above gross sales for 1949. Sales in 1951 increased $235,285 above sales in 1950. We have taken into account the fact that petitioner has paid dividends each year since its *170 organization. Due weight has been accorded to the testimony of petitioner's expert witness and to respondent's witnesses. Upon the basis of the entire record, we find that the services rendered by Harney and by Thompson were substantially the same in the fiscal years 1950 and 1951, and that reasonable compensation for the services of Harney and of Thompson in each of the fiscal years 1950 and 1951, is $45,000, each. It is held that petitioner is entitled to deductions in 1950 and 1951, for ordinary and necessary business expenses, under section 23(a)(1)(A), 1939 Code, in the amount of $90,000 for compensation to its two officers. Decision will be entered under Rule 50. Footnotes
*. Approximate.↩